UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

IN RE:

EVERETT DAVIS and
ARITHA DAVIS,

    Debtors.
_____/

Case No. 12-33624-dof
Chapter 13 Proceeding
Hon. Daniel S. Opperman

OPINION REGARDING DEBTORS' MOTION FOR CONTEMPT

Before the Court is the Motion filed by Debtors asking this Court to find creditor Melody Davis and the Genesee County Friend of the Court ("FOC") in contempt for alleged violations of the automatic stay. After an evidentiary hearing and full briefing from both sides, the Court issues its Opinion.

Facts

On March 22, 2010, a Consent Judgment of Divorce was entered by the Genesee County Circuit Court–Family Division ("Divorce Judgment"). The Divorce Judgment (admitted as Exhibit 1) contained the following relevant provisions regarding the payment of spousal support to be paid by Debtor Everett Davis to his former wife, Melody Davis:

> Support: Until otherwise ordered by the Court, and starting on 02/01/2010 the following provision shall control the support obligations of EVERETT T. DAVIS,
> SR., ("Payer") and MELODY DAVIS, ("Payee-Recipient"):
>
> A. Spousal Support for Recipient-Payee: Payer shall pay spousal support as set forth in the Uniform Spousal Support Order, entered with this Judgment.
>
> B. Administration and Enforcement: The support payment shall be administered and enforced according to federal and state laws, as incorporated in the Uniform Support

1

Orders.

* * * *

IT IS FURTHER ORDERED that

1. Spousal Support. Spousal support shall be paid monthly
as follows:

Payer: EVERETT G DAVIS SR
Payee: MELODY DAVIS
Effective Date: 02/01/2010

Spousal support in the amount of $1600 shall be paid
through the State Disbursement Unit and paid to the
payee…

2. Income withholding takes immediate effect for those items
payable through the State Disbursement Unit.

3. This Order continues until the following events:

x Death of the payee.

x For a period of twelve (12) years and further, spousal support
does not terminate upon remarriage or Plaintiff's (Debtor's) death
and is non-modifiable alimony in gross.

UNIFORM SPOUSAL SUPPORT ORDER
IT IS FURTHER ORDERED that the Uniform Spousal Support
Order (USSO) is incorporated herein by reference.

The referenced Uniform Spousal Support Order ("USSO") (admitted as Exhibit 2) was entered contemporaneously with the Divorce Judgement. Debtor Everett Davis filed a motion for relief from the Divorce Judgment on April 12, 2010, challenging that the support would continue regardless if Melody Davis remarried, and further challenging the non-tax deductible status of the support payments. The State Court denied the motion for relief, stating in an order entered on April 16, 2010:

> There is no allegation of fraud or any misconduct of the parties. In fact, the

parties and their counsel agreed, on the record, to alimony in gross, which is non-modifiable alimony for a term of years. This is a property settlement, which by definition is non-modifiable, does not terminate on occurrence of remarriage, and is not tax-deductible.

On September 5, 2012, Debtor Everett Davis and his wife, Debtor Aritha Davis, filed a Chapter 7 bankruptcy petition, which was later converted to a Chapter 13 proceeding on November 13, 2012. Debtors' Chapter 13 plan was confirmed by Order dated January 18, 2013. Debtors filed the instant Motion for Contempt against Melody Davis, as well as the FOC, asserting that both violated the automatic stay by intercepting Debtors' 2012 tax refund in April 2013, and particularly, that the FOC caused show cause hearings to be scheduled beginning in March 2013, for alleged non-payment of spousal support payments under the Divorce Judgment, and for causing what Debtors allege to be an "extra judicial" order of income withholding to be sent to the Michigan Unemployment Insurance Agency, with an effective date of September 8, 2013, directing $1,603.50 to withheld per month from Debtor Everett Davis' unemployment insurance. Debtors assert that these actions were taken in retaliation by Melody Davis and the FOC for refusal of Debtors to consent to allow the FOC to file a late claim on behalf of Melody Davis in the bankruptcy case.

Melody Davis responds that she never received formal notice of the Chapter 7 bankruptcy filing, of the conversion to Chapter 13, or of the Order Confirming the Chapter 13 Plan entered on January 18, 2013.[1] She asserts and testified to such at the evidentiary hearing, that the incorrect address was used up until September 2013, when the instant Motion for Contempt was filed. The FOC also contends it did not receive notice of Debtors' bankruptcy

---

[1] Melody Davis has filed a separate Motion and has requested as part of her response to the instant Motion for Contempt that the January 18, 2013, Order Confirming Plan be set aside as to Debtors' treatment of any debt owing to her. The Court will issue a Scheduling Order as to this Motion/request.

3

until summer of 2013, when a phone call was placed by Debtors' counsel to the FOC on July 12, 2013, which caused a stop to issuance of a bench warrant after a July 17, 2013, show cause hearing took place as to Mr. Davis' failure to payments under the Divorce Judgment. The FOC agrees that Mr. Davis had made payments regularly until November 2011, when he lost his employment, then restarted, then stopped again on November 29, 2012, a few months after the bankruptcy filing. Payments then resumed on April 5, 2013, with the last payment being made on July 13, 2013.

Both Melody Davis and the FOC assert that the obligation at issue is alimony, maintenance or support, so that such qualifies as a domestic support obligation to which an exception to the automatic stay exists for the actions taken including interception of a tax refund and institution of income withholding orders to enforce the Divorce Judgment.

At the evidentiary hearing on this Motion, which spanned over two days, the Court heard and considered the testimony of Melody Davis, family law attorney Julie Griffiths, Everett Davis, and FOC attorney Susan Root.

Melody Davis testified as to the details of her marriage and subsequent divorce from Mr. Davis. Melody Davis earned significantly less than Mr. Davis during their marriage and at best was taking home about $400 per week, compared to Mr. Davis' earnings of $1,700 per week. Melody Davis testified that she asked for alimony because of the disparity in the income, as well as the fact that she needed income to continue her lifestyle.

Melody Davis testified that her address was 5280 Timberwood Drive at the relevant time, and that she lived in a building with nine units in each building, and with five to six buildings in the entire complex. Apparently, every unit has its own number and there is no 5208 Timberwood Drive, which was the address used by the Debtors on their bankruptcy petition.

She also testified that she did not receive any notice until the instant Motion was filed in September 2013. She did acknowledge that Mr. Davis contacted her in late fall, early winter of 2012, because he was concerned that a bank was going to contact her about the balance owed on a mortgage on jointly owned property. Regardless, she denies receiving any notice of the bankruptcy until she received the instant Motion in September 2013. She also claims that Mr. Davis never told her the ramifications of the bankruptcy to her. She also denies receiving any other correspondence and was not sure how she received a copy of the instant Motion, other than it was placed in her mailbox. She also testified that she did not ask the FOC to enforce the Divorce Judgment, but that she did attend two show cause hearings and that Mr. Davis missed at least one, if not both, of those hearings.

The next witness was Julie Griffiths, an attorney who has practiced family law for 26 years in Genesee County, Michigan, and files hundreds of cases per year in the Genesee court system. She admits that she drafted the Divorce Judgment, as well as the Uniform Spousal Support Order, and also prepared the so-called Prognosticator (admitted as Exhibit 7). She used the information put in the Prognosticator by subpoenaing records of Mr. Davis. Ms. Griffiths testified that the Prognosticator set a monthly alimony of about $2,100, and placed the marriage at a level 2, which has an extremely high probability of alimony being paid. She testified that she was negotiating with the third of three attorneys that Mr. Davis hired, and that Mr. Davis' attorney, on behalf of his client wanted a certain limitation placed on the alimony. The two negotiated back and forth with Mr. Davis wanting lower alimony over a shorter period of time and Melody Davis wanting more alimony forever. The two apparently met with the judge presiding over the divorce case, Judge Theile, and it was ultimately agreed that the payment would be $1,600 per month for twelve years, with the alimony ending upon Melody Davis'

death, but she would have a claim against Mr. Davis' estate if he died before the twelve years expired. The other factor that Mr. Davis' attorney was pressing was the fact that there needed to be a finite figure with no right for Melody Davis to come back to court for an increase in the event she was ill or lost her job.

Ms. Griffiths testified that the final amount agreed upon was calculated by taking $1,600 x 12 months x 12 years, and that there was no way this amount could be considered to be a property settlement because there was no corresponding credit to counter balance the pool of marital assets.

Mr. Davis next testified that he first talked to his former wife, Melody Davis, in December of 2012, when she called him about the credit union closing her account. This was after his September 5, 2012, Chapter 7 bankruptcy filing, and the November 13, 2012, conversion of the case to Chapter 13. He does not recall whether he told Melody Davis that he had filed Chapter 7 or Chapter 13, but in his mind, he believed by December 2012 she knew something was pending concerning bankruptcy.

Mr. Davis' testified that he first told the FOC that he had filed bankruptcy when he visited the FOC office in March 2013. Mr. Davis then testified that he contacted the FOC when he attended a show cause hearing on May 8, 2013, and a referee with the FOC, Referee Hood, continued the show cause hearing to July 17, 2013. Mr. Davis testified that he told Referee Hood that he had lost employment and he thought that his spousal support obligation was discharged in his bankruptcy. Mr. Davis testified that he lost his job at Consumers Energy, and thereafter received a severance package of $70,000, which netted him over $50,000. Mr. Davis testified that he can receive his pension at age 58, which is about five years away. In the meantime, he is not earning any money at this time, and he and his family are living on

6

unemployment and other miscellaneous means.

Mr. Davis testified as to how he viewed the calculation of the $1,600 monthly amount. He stated that the marital home that he and Melody Davis owned, which Melody Davis was then living in, had a monthly mortgage payment of $1,200, and the $1,600 payment under the Divorce Judgment was intended to pay for Melody Davis to retain the home, leaving her with $400 for her monthly living expenses on top of what she earned from her employment at Meijer. Subsequent to the divorce, however, Mr. Davis had filed a petition in state court, and there was an order entered, which gave him the right to possess the marital home because Melody Davis had abandoned the property.

Susan Root was the final witness. Ms. Root is an attorney with the FOC and has been employed as such for eight years. She testified that the FOC follows the statewide policy imposed on the FOC and she keeps up with issues by reading those publications, as well as miscellaneous ones regarding bankruptcy. The general policy of the FOC is that when a bankruptcy notice is given, the FOC codes the system to shut down various garnishments, to call back warrants and orders to show cause, and there is no further effort to enforce any arrearage in bankruptcy. An individual by the name of Patricia Warden is the paralegal with the FOC in charge of noting all bankruptcies, and when she receives a notice she takes the appropriate action. In the Davis case, Ms. Root testified that there was no notice given to the FOC, so the FOC continued its collection efforts until the summer of 2013. Ms. Root testified that the first notice given to the FOC per its records is a telephone call that Mr. Davis' bankruptcy counsel, Richard Ponsetto, placed with Mr. Battles, the FOC, on July 12, 2013, regarding the July 17, 2013, order to show cause hearing. Per Ms. Root, there was a note put in Mr. Davis' file on July 12, 2013, that a bankruptcy had been filed, and the FOC took the necessary action to stop

collection activities. For one reason or another, however, Referee Hood did not see that note, so she recommended that a bench warrant be issued. Fortunately, the case worker in charge of this file noted the bankruptcy and stopped the procedure before a judge issued a bench warrant. The FOC has no record of any contact in March or May of 2013 regarding a bankruptcy filing.

Ms. Root testified that the FOC has taken the action to zero balance, the amount owed by Mr. Davis at that time, which insures that there will be no further action taken by the FOC or any of the other agencies. Ms. Root testified that she recognized that her testimony is in contrast to her reply letter to Mr. Ponsetto that she admitted had some incorrect statements. Per Ms. Root, the FOC receives everything electronically from the Circuit Court, the case worker notes the appropriate information and sends it over to a bookkeeper, who then works off of the USSO to send a wage or income withholding order to the appropriate entity with a copy to all parties. The order itself is enforced until circumstances change. Unless there is a question about the USSO, the USSO is not looked at again.

Ms. Root testified that the FOC was considering filing a proof of claim for the arrearage as a priority unsecured claim, but apparently now is willing to let Melody Davis do that on her own. Ms. Root did testify that she looked at the USSO and even though she is not an expert on alimony thinks that the USSO was for non-modifiable alimony and in the form of spousal support when one looks at both the USSO and the Divorce Judgment.

Ms. Root did note that the first payment was received from Mr. Davis' employer, Consumers Energy, on April 30, 2010, and that Mr. Davis was regular with payments until November of 2011, when unemployment benefits started being received, and then stopped on November 29, 2012, but then restarted April 5, 2013, through June of 2013. There was one payment made on July 13, 2013, but no payments thereafter.

8

Ms. Root also detailed the steps taken by Mr. Battles' secretary to stop any further action and to cancel the July 17, 2013, hearing. Finally, Ms. Root testified that the FOC does not actually make a determination as to what spousal support is, but merely enforces the USSO.

Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(G) (motions to terminate, annul, or modify the automatic stay).

The issues in this matter arise from Title 11 of the United States Code and do not involve any matter which limits this Court's jurisdiction as detailed by the United States Supreme Court in *Stern v. Marshall*, ---- U.S. ----, 131 S. Ct. 2594, 2608, 180 L.Ed.2d 475 (2011), and later by the United States Supreme Court in *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014). *See also Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

Law

Violation of the Automatic Stay

Section 362(a) automatically stays all proceedings against the debtor as follows:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of –

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of this case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . .

Thus, a bankruptcy petition operates as a stay of "any proceeding to recover a claim

9

against the debtor" and "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The purpose of the automatic stay is to give the debtor a "breathing spell from his creditors." *In re Banks*, 253 B.R. 25, 29 (Bankr. E.D. Mich. 2000). The legislative history indicates that the stay provides a debtor broad protection from his creditors by stopping all collection efforts, all harassment, and all foreclosure actions. *Id*. (citation omitted).

Section 362(k)(1), in relevant part, states:

[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

A party violates the automatic stay by taking any action prohibited by section 362(a) after receiving notice of a bankruptcy filing. *Id*. "Knowledge of the bankruptcy filing is the legal equivalent of knowledge of the stay." *In re Daniels*, 206 B.R. 444, 445 (Bankr. E.D. Mich. 1997) (quoting *In re Wagner*, 74 B.R. 898, 904 (Bankr. E.D. Pa. 1987)). To show liability under section 362(k), the Debtor need only show actual notice of the bankruptcy and an act in violation of the stay. "Satisfying these requirements itself creates strict liability. There is nothing more to prove except damages." *Daniels*, 206 B.R. at 445. The automatic stay requires creditors to take affirmative steps to halt or reverse any pending suits or collection efforts begun prior to bankruptcy, including garnishment, repossession of a vehicle, and foreclosure of a mortgage or lien. *Banks*, 253 B.R. at 30.

The Court must first question whether there was actual notice. If actual notice was given, the Court next questions whether the actions taken were in violation of the automatic stay. The issues of how done and with what motive, whether willful or not, are irrelevant.

<u>Section 362(b)(2): Exception to the Automatic Stay Concerning Certain Domestic Support Obligations</u>

10

12-33624-dof    Doc 118    Filed 09/23/14    Entered 09/23/14 13:31:46    Page 10 of 16

As discussed in Collier on Bankruptcy, a noted treatise on bankruptcy law, the burden is upon the party seeking the protection of the stay when the issue of whether an exception to the stay applies under Section 362(b):

> In effect, by excepting particular acts or actions from the stay, Congress has shifted the burden of seeking relief to the party seeking the protection against those acts. An injunction may be issued, but only under the normal standards for injunctive relief.

Collier on Bankruptcy, ¶ 362.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Section 362(b)(2) of the Bankruptcy Code provides an exception from the automatic stay under certain circumstances concerning domestic support obligations pursuant to Section 362(b)(2)(A)-(C):

> **(b)** The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay--
>
> \*\*\*\*\*
>
> **(2)** under subsection (a)--
>
> > **(A)** of the commencement or continuation of a civil action or proceeding--
> >
> > > **(i)** for the establishment of paternity;
> > >
> > > **(ii)** for the establishment or modification of an order for domestic support obligations;
> > >
> > > **(iii)** concerning child custody or visitation;
> > >
> > > **(iv)** for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate; or
> > >
> > > **(v)** regarding domestic violence;
> >
> > **(B)** of the collection of a domestic support obligation from property that is not property of the estate;
> >
> > **(C)** with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute;

11

The term "domestic support obligation" is defined in the Bankruptcy Code at Section 101(14A):

> (14A) The term "domestic support obligation" means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is—
>
> (A) owed to or recoverable by—
>
> (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>
> (ii) a governmental unit;
>
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
>
> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of—
>
> (i) a separation agreement, divorce decree, or property settlement agreement;
>
> (ii) an order of a court of record; or
>
> (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
>
> (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

There is extensive case law regarding domestic support obligations under Section 523(a)(5). In a Chapter 13, Section 1328(a)(2) excepts debts from discharge under Section 523(a)(5). "'The terms "alimony" and "support" are given a broad construction to promote the Congressional policy that favors enforcement of obligations for spousal and child support.' 'Congressional policy concerning § 523(a)(5) has always been to ensure that genuine support

obligations would not be dischargeable.'" *Goans v. Goans (In re Goans)*, 271 B.R. 528, 531-532 (Bankr. E.D. Mich. 2001) (quoting *Bailey v. Bailey (In re Bailey)*, 254 B.R. 901, 905 (B.A.P. 6th Cir. 2000) (quoting *Hayes v. Hayes (In re Hayes)*, 235 B.R. 885, 891 (Bankr. W.D. Tenn. 1999) (internal citations omitted))). The rationale favoring a liberal construction for the term "support" in the former Section 523(a)(5) is equally applicable to its BAPCPA replacement contained in Section 101(14A).

The absence of specific language designating an obligation as alimony, maintenance, or support does not foreclose a finding that an obligation is in fact such. *See, e.g., Calhoun v. Calhoun (In re Calhoun)*, 715 F.2d 1103 (6th Cir. 1983); *Fitzgerald v. Fitzgerald (In re Fitzgerald)*, 9 F.3d 517 (6th Cir. 1993); *Harvey v. McClelland (In re McClelland)*, 247 B.R. 423, 426 (Bankr. N.D. Ohio 2000) ("[I]n cases such as this, where the state court has not specifically labeled an obligation as support, this Court must look behind the award that is made under state law and make an independent factual inquiry to determine whether the award is actually in the nature of support.").

In *Calhoun*, the Sixth Circuit established an analytical framework for determining when an obligation, not specifically designated as alimony, maintenance, or support, is nonetheless in the nature of support and therefore non-dischargeable. This four-step analysis is as follows:

> First, the obligation constitutes support only if the state court or parties intended to create a support obligation. Second, the obligation must have the actual effect of providing necessary support. Third, if the first two conditions are satisfied, the court must determine if the obligation is so excessive as to be unreasonable under traditional concepts of support. Fourth, if the amount is unreasonable, the obligation is dischargeable to the extent necessary to serve the purposes of federal bankruptcy law.

*In re Fitzgerald*, 9 F.3d at 520 (citing *Calhoun*, 715 F.2d at 1109-10).[2]

---

[2] Although the application of *Calhoun's* framework has been limited by subsequent precedent, it is still fully relevant in scenarios, where the obligation is not expressly designated as being in the nature of alimony, support, or maintenance. *In re Goans*, 271 B.R. at 533 (citing *Luman v. Luman (In re Luman)*, 238 B.R. 697, 705 n.2 (Bankr. N.D. Ohio 1999) (When the obligation is not labeled support *Calhoun* still

13

The burden of proving the obligations at issue are in the nature of support is on the creditor, who must first show that it was the intent of the parties or the state court to create a support obligation. *Id.*

> In determining intent, the bankruptcy court may consider any relevant factors, including: the nature of the obligation; the structure and language of the divorce decree; whether other lump sum or periodic payments were also provided; the length of the marriage; the relative earning powers of the parties; the age, health and work skills of the parties; the adequacy of support absent the obligation in question; and evidence of negotiation or other understandings as to the intended purpose of the obligations.

*Goans v. Goans (In re Goans)*, 271 B.R. 528, 533 (Bankr. E.D. Mich. 2001).

## Analysis

The Court must first decide whether the FOC and Melody Davis had actual notice of the bankruptcy filing. The Court finds that Melody Davis knew to some degree by December 2012 of the bankruptcy, because of a verbal conversation occurring around that time between her and Debtor Everett Davis. There is no proof, however, as to the nature of that notice, and whether Melody Davis knew under which chapter the bankruptcy had been filed. The FOC did not have notice of the bankruptcy until July 12, 2013, as supported by the undisputed testimony of FOC attorney, Susan Root. Keeping in mind it is Debtors' burden, as the Movants' here, to establish actual notice was given, the Court concludes, that the actions complained of by Debtors were not protected by the automatic stay because the required notice was insufficient to alert Melody Davis and the FOC of the bankruptcy.

Even if the Court were to find that actual notice existed, the debt at issue is clearly a domestic support obligation. It is Debtors' burden to establish that an exception to the automatic stay should not apply. The Court finds that a clear reading of the Divorce Judgment shows that the $1,600 payable by Mr. Davis to Melody Davis was intended to be and is spousal support, and thus, a domestic support obligation under Section 101(14A). The word "support" and the phrase

---

applies.)).

"spousal support" is used numerous times in the Divorce Judgment. The testimony of the witnesses further supports that the payments agreed to were intended as support. Mr. Davis' income of approximately $90,000 per year at the time of the Divorce Judgment simply does not compare favorably to the income of Melody Davis of approximately $25,000 per year. The payments negotiated were clearly intended for the support of Melody Davis for the 12-year period negotiated between the parties at the time. Mr. Davis' divorce attorney negotiated long and hard for a set amount of alimony that was non-modifiable because Melody Davis was arguably entitled to more per month, and he and his client were fearful Melody Davis may attempt at a later date to try to increase the support payments. Thus, the amount negotiated for support may have been considered on the higher side at the time, but was agreed to be for a set period of time as part of the settlement negotiation for the support of Melody Davis due to the disparity in income and to continue her lifestyle after the divorce. The conflicting language in the state court's April 16, 2010, Order does not negate the clear intention of the parties at the time that the $1,600 monthly payments be for the support of Melody Davis as alimony.

Applying the *Calhoun* factors, the Court concludes the obligation owing from Mr. Davis to Melody Davis was in the nature of alimony, maintenance, or support and, thus, a domestic support obligation under Section 101(14A):

(1) The Court concludes that the parties and the state court intended to create a support obligation;

(2) The obligation Mr. Davis owed to Melody Davis had the necessary effect of creating support;

(3) The obligation was not excessive and was reasonable under the circumstances; and

(4) Because the amount to be paid was reasonable, the purposes of federal bankruptcy

15

law are served.

The testimony of Melody Davis and Julie Griffiths, coupled with the language of the Divorce Judgment itself, support a conclusion that the obligation at issue was and is a domestic support obligation, and the actions taken to collect this obligation from Mr. Davis' income, were, therefore, not protected by the automatic stay by virtue of Section 362(b)(2)(C), excepting actions "with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute." Debtors have not met their burden in showing that an exception does not apply to the obligation owing Melody Davis under the Divorce Judgment.

## Conclusion

For the above stated reasons, the Court determines that the Genesee County Friend of the Court and Melody Davis did not violate the automatic stay. The Court will enter an appropriate order.

**Not for Publication**

```
Signed on September 23, 2014
                                          /s/ Daniel S. Opperman
                                        Daniel S. Opperman
                                        United States Bankruptcy Judge
```